Good morning. May it please the Court, my name is Scott Pollack. I represent the Plaintiffs' Society of the Divine Word and Father Paul Chen, or Zongshui Chen in his Chinese name. More than anything, this case, at this point in time, implicates the Catholic Church's ability to put one of its Catholic priests in service as a priest. Now, the government agrees that the can't assign Father Chen to ministry in the United States without violating provisions of the Immigration and Nationality Act that prohibit unauthorized employment. The government draws a distinction between employment of a priest and religious exercise, and the government characterizes the burden that is placed on the plaintiffs as a mere inconvenience and attempts to shoehorn it into this Court's Navajo Nation's case by calling it a simple spiritual diminishment that the SVD can't put Father Chen into any position. As I understand your religious freedom argument, we would find, in light of what you just argued, that there is a substantial burden on Father Chen's exercise of religion, but wouldn't we have to remand to the District Court for a determination as to whether or not there is a compelling interest in enforcing the immigration laws that overrides his calling to be a priest? Right. Unless this Court were to find that, in some sense, the government has waived that because they had an opportunity to argue that before the District Court. But the District Court never reached the issue on summary judgment because it basically awarded summary judgment to the government on the argument that because the passport was invalid, he couldn't meet the requirements for adjustment of status, right? Correct. So if we agree with you on the RIFRA claim, the government hasn't waived anything, and it hasn't had the opportunity to make that argument, and the District Court hasn't ruled it. I wouldn't disagree. I think that a remand would be one of the appropriate remedies that this Court could consider. Now, on the question of what is a substantial burden or whether the plaintiffs have been burdened, the government takes the position that the plaintiffs can pray and they can get together and discuss religion, and as a consequence, there's no substantial burden. But we look at it much differently, and I think that we look at it in a sort of realistic day-to-day, how are the plaintiffs being impacted by their situation. But in the Sherbert v. Verner case, Judge Brennan, Justice Brennan, said that the state has to show that there is no infringement on free religious exercise. Well, Counsel, do you think that your RIFRA argument is the strongest argument? I think that the RIFRA argument is fundamental in this case, because even assuming that the government's statutory interpretation and interpretation of their regulations is correct, then RIFRA would still require the Court to consider and impose an exemption of the requirements of the Immigration Act. Is that because your client is a priest? Because my client is a priest and a religious order. But, okay, so wouldn't a person who was a doctor, who was caught in the same situation of not having a passport, so he can't work here and he can't go back and work, isn't that, wouldn't he be in the same position? I'm just not sure I understand why we should, just because this person happens to be a priest in this situation, we apply, he gets an exemption from the application of the law that someone who's in another profession wouldn't. Well, it's simply because Congress passed RIFRA and said that in cases of a law of general application, such as the Immigration and Nationality Act, government shall not substantially burden religious exercise unless it has a compelling interest to do so. The only, the distinction from your example is that the doctor is not engaged in any sense in religious exercise. So, yes, this is different because Father Cheney is a priest. I'm not familiar with RIFRA being applied in this context. What is the closest authority that you have that would, in essence, treat the priest differently? Well, we've cited most of the cases that we could find in our briefs. There is nothing specifically on point with this case. There was one case in which this Court decided that a RIFRA claim could not be approved without approval proceedings, but the factual context was completely different. This is, in a sense, close to the prison type of cases in which a prisoner wants to engage in some sort of religious exercise in violation of prison rules or penal rules. The case that I like to turn to is a District Court case where it's the Campos v. Coughlin case in which then-District Judge Sotomayor was called upon to decide whether or not an adherent to the Santeria religion was able to wear their devotional beads. The prison rules were that they could possess the beads but not wear them based on the concerns that wearing them would transmit some thought that they were involved in gang activity. Judge Sotomayor decided that, well, if the religion requires the wearing of the beads, a public display, the prison rule that you cannot wear the beads would violate RIFRA. Well, that's a Yoder claim. You were talking about a Sherbert claim earlier. We have both claims in this case, Your Honor. I think, in a sense, our Yoder claim is stronger because the Society of the Divine Word cannot put Father Chen to work without incurring liability. A Yoder claim is that your client is being coerced to act contrary to religious beliefs by the threat of criminal or civil sanctions. What have they said that he must do that violates his Catholic or Christian beliefs? Well, they have said that he cannot be placed in a ministry setting. They say he can't do something. What is he being coerced to do that acts contrary to Catholicism? What we have is a missionary priest who is unable to serve as a missionary priest. He cannot marry people. He cannot teach or preach religion in a parish. The Yoders were forced to send their kids to school, and it violated their religious beliefs. That seems to be different than someone who can't do something that he'd like to do. Well, there is... He can't practice his profession, is essentially what you're saying. He cannot practice his religious vocation without the Society of the Divine Word and he being subject to civil and possible criminal penalty. What is analogous is that the plaintiffs are forced to choose between adhering to the law under the Immigration Act or engaging in their religious activity, which is part and parcel of what they are required to do. The Society of the Divine Word has prepared Father Chen for ministry over the course of more than a decade. They're not asking him to choose. They're not asking him to choose. They're saying you don't have immigration status, and it's because China won't give him a passport. That doesn't seem to me like a choice between exercising religion. No, there is a definite choice, Your Honor. If they choose to exercise their religion by putting Father Chen into a parish, and they've refrained from doing so because they have this choice of whether to do so. They have chosen to comply with the immigration laws by not putting him into a ministry setting. It's been over two years since he was ordained. At what point does that become a substantial burden on religion? Counsel, could you address the other claim in your case? You're running out of time here. Certainly. And I'm really interested to hear about your argument on the APA claim. That's fine. And if possible, I'd like to reserve a few minutes of rebuttal as well. You'll have to keep track of your time, and you have five minutes left total. All right. Very good. We think that the government's position on the passport requirement is unreasonable. The statute does not require an applicant for a change of non-immigrant status to have a valid passport. The regulations specifically do not require it either. The district court judge did read into a regulation dealing with an extension of status that it should also apply to a change of status. But it's not there in the change of status statute or regulation. Now, that's the first reason that the government's position is unreasonable. The second is that the statute that the government relies on, which is 8 U.S.C. Section 1182A7, the ground of inadmissibility for not possessing a passport, it applies to people who are outside of the United States. But also, it includes and cross-references a specific waiver provision which would, in cases of unforeseen emergencies, allow the government to waive the passport requirement. The form on which someone applies for a change of status, it's the I-539 form, also says in the instructions, you should have a passport. But if you do not, you can provide an explanation as to why you do not. We read into that language a mechanism for waiving the passport requirement if such a requirement does exist. So does this really boil down to, I'm sorry, Father Tim, but we just didn't have a form that accommodated your unique situation? I think that's what the government is arguing. They're saying that because there is no mechanism for breathing life into this waiver, then it just does not exist. And there again, I would come back to our religious freedom argument. Even if they are correct, and even if this court were to find that that's a reasonable position, as the district court did, there would still have to be an exemption under the Gonzalez versus Ocentro-Espirita case that this court must recognize an exemption, a judicial exemption. The district court was unwilling to go that route. But the two cases that the Supreme Court has decided on RFRA establish, first in the city of Gorin versus Flores case, that RFRA fundamentally changes federal law, that it has sweeping impact. And I think we should not disregard that observation. The second case, the Ocentro-Espirita case, specifically at page 434, says that the way that RFRA works is that judges shall make exemptions. And I think that we're called upon to make that judgment if there is a substantial burden on the plaintiff's religious exercise, which I think is almost unavoidable. They simply cannot practice as priests in the way that they are called upon to do by their religion. Suppose Father Chen were coming into the United States and sought admission, saying my calling is to proselytize in the United States. Could the government exclude him? I think that we would. I would hesitate to give an answer to that, Your Honor. I think the answer is it could. I think that the statute allows for any claims as to a burden on religion. But if we rule in your favor, I don't see how we would be able to prevent anybody anywhere in the world from saying my calling is to come and, you know, maybe, well, I wouldn't say that. But my calling is to come and proselytize here in the United States, and you're interfering with my exercise of religion by not allowing me in. I think that that comes close to a floodgates argument, which the Supreme Court in O Centro Aspirita cautioned against. I think there are ways to limit this court's decision to the facts of this case. No, but the problem is you can't, you don't want a blanket holding that special benefits have to be given to people, or blanket exemptions have to be given to people from simply because they want to practice, because their vocation is religious. Well, what you've recognized is there are no other cases quite like this. This is not your typical immigration case. Thank you. With that, you have used your time. If we have any questions for you, we'll let you have them in at number five. Thank you. May it please the court. My name is Aram Gabor, and I represent the United States government defendants in this matter. This is a case where a Chinese national is seeking to remain in the United States because he no longer has a valid unexpired passport or any other means to remain here. The Religious Freedom Restoration Act argument and the claim itself is inappropriate because it does not fall within Navajo Nations to prescribe tests that demonstrate substantial burden. It does not fall under Yoder, nor does it fall under Sherbert. However, before I begin, I do want to bring forth a threshold argument that was not briefed by the government, and the government does apologize for this. However, it came up quite recently in preparation for this argument. Petitioner is seeking a B-2 non-immigrant tourist visa. The B-2 visa itself does not fall within the regulation, ACFR Section 274A.12 or 13, which authorizes employment in the United States. And as a result, the RIFRA claim is not justiciable because there is no order that this court can give, even if granting the B-2 visa, that would allow Mr. or Reverend Chen to be employed in the United States under Society of the Divine Word. I saw that, and I thought that he was just claiming that he wants to work in Hong Kong for the Catholic Church. Doesn't that matter? Well, Your Honor, his initial argument before the district court was that he wanted to remain in the United States until his passport issue came forth. However, now the argument in the RIFRA claim is that he wants to work in the United States. Indeed, this court should agree that RIFRA would not apply for a religious vocation outside of the United States. Therefore, the only potential claim that he would rise for RIFRA would be for employment within the United States. Moving forth, though, the RIFRA claim itself is inappropriate. As the district court properly found, and this court should find, Navajo Nation quite clearly demonstrates and sets forth the two tests for what substantial burden should be defined as. And a visionary clearly states that any spiritual diminishment, even substantial, I'm sorry, wrong word, not substantial. But spiritual diminishment, as great as it may be, does not rise to the level of substantial burden for the Religious Freedom Restoration Act unless either Yoder or Schubert is met. Well, would you explain to me what this fellow's status is? And where does he live? What does he do? Well, it's not in the record where Reverend Chen currently lives, but presumably in the Society of the Divine Word compound, I believe, in Chicago, Illinois. No, I mean, he's in this country. He's in this country without status. The 120 days voluntary departure period that was granted by discretion with the sui sponsor reopening of the underlying Citizenship and Immigration Services decision expired on August, I'm sorry, October 24, 2009. Where was he supposed to go? Well, he was supposed to return to China. The point is, Your Honor, if I may. Return to China because China won't give him a new passport. I mean, this reminds me of that movie with Tom Hanks. Should we put him out at O'Hare Airport and have him say masses for travelers? You know, never leave the international departure area because he's now a stateless person. I mean, Your Honor, what does he do? The government, allow me to explain. First, this is a problem that Reverend Chen created for himself. When he graduated from the Catholic Theological Union with his master's degree in 2009, he had a month to leave the United States while his People's Republic of China passport was still valid. He did not do so. He stayed in the United States past the validity of his passport. This is a problem that he created for himself, unlike Tom Hanks. Okay. So the fact that he applied months before with the Chinese consulate to renew his passport and the Chinese consulate stonewalled him and therefore his passport became expired, is that you would concede he did everything he could do to try and get his Chinese passport extended, right? The government would, the record does demonstrate that he did. You're not going to concede anything. Apparently not. The government concedes to this particular issue. Oh, you do? Oh, great. That he tried to get his passport at least up to the point where the complaint was filed in district court. The government doesn't know at this point. However, there was a one month period where he could have left the United States with a valid passport and did not. Of course, he couldn't go to, he would need a visa to go to Hong Kong, which is where the society wanted to send him. That's correct. That's correct, Your Honor. But that is an issue with the People's Republic of China, and he cannot seek addressability in the United States for China's decision. However, what happens now? And the answer is this. He is removable from the United States because he's in the United States without authorization to remain here. Where are you going to remove him to? Well, after the issuance of an NTA, and if he is found removable from the United States, the State Department would then endeavor to seek and acquire travel papers, laissez passer, to return to China. I.e. a new visa or something from the Red Chinese government that they'll take him back, which he doesn't have it. Correct. Now, if those papers, if China, the People's Republic of China, with the request from the State Department does not provide those papers to return to China, the United States just cannot remove him from the United States without a country to remove him to. So we're back to O'Hare. No. He would actually be allowed to stay in the United States. Not to O'Hare, but to walk around. But he couldn't work. Theoretically, and this is looking far out, if he had an order of removal, but the United States could not remove him from the United States, he would then be allowed to remain in the United States and work for Society of the Divine Work. Have you guys tried to mediate? This is a case that cries out for mediation. It really does. And I understand that your client is concerned about the floodgates argument that, you know, we're going to create an exemption here that potentially could cause other problems down the road. But this guy really is caught between a rock and a hard spot. And I hear your argument that he should have left immediately as soon as he graduated from the seminary. But he did, it seems to me, he was pure of heart. He did try to get his Chinese passport extended so that he could then get a visa to go to Hong Kong. And the red Chinese didn't want to do it. And we can speculate as to why they don't want to do that for Catholic priests. But that's not within the record. Right. And those submissions for the purposes of this appeal are inappropriate because they weren't before the district court. I'm not sure that mediation is going to, I don't know. Have you tried to settle this out? With some kind of accommodation? I have engaged in conversations with opposing counsel. They were not fruitful. And specifically, the remedy in this circumstance, should this court deny these claims and affirm the district court decision, is that he would be, he would be, have a notice to appear, go through removal proceedings. He would have the opportunity if he so desired to file an asylum application, perhaps for varying circumstances outside of the one-year bar. And nonetheless, if the United States could not remove him to China, or if there was a concern that China might persecute or torture him upon removal, the United States would not remove him to China. And if China does not accept him anyways, in the United States, he will likely remain and gain authorization to work in every capacity that Society of the Divine Word and plaintiff allege falls within this RFRA claim. All right. So your understanding of what he wants that that would not give him is that he wants to go, that the society wants to send him to Hong Kong? That was what was included in the supplemental documents or the attachments to the original complaints. However, plaintiff or petitioner has included statements in since filings that the argument is that Society of the Divine Word, in lieu of sending him to China, if that's not available, wants to employ him under a religious vocation in the United States as a missionary priest. Additionally, the limitation on Mr. Chan's ability to say mass, to marry people, is a limitation placed upon him by his own order, not the United States. The question for employment is about compensation. He cannot be compensated for these activities. And this does not fall within a religious. Well, if I understand, do I understand the government to be saying that if he proceeds through deportation and there is no country that China won't take him, he has no passport so he can't get any, get in any place else, that he can stay here and work? Theoretically, that is what will happen. The United States cannot remove. Are you saying that on behalf of the government, that that's the way that this, that that's the way that the law would operate in this case? Well, Your Honor, it's difficult. This presumes a hypothetical. That's not before this court. But I am saying my understanding of the law. Well, there is a person, I mean, I understand you agree that there's no case exactly like this out there. Yes, Your Honor. Well, but you have a person who is not, who doesn't have a passport and therefore can't legally enter any other country. And if he cannot legally enter another country, the United States would be required to allow him to remain in this country and as well gain employment to work here. And is there a law, authority, is there a statute or a reg or something that says that? If the court would prefer, I can file a 28J on that particular point. I do not have the statutory authority, regulatory authority or case immediately available to me because it's not within the record. Well, I don't know that this 28J is going to do us much good. I was hoping that you all would jump at the chance to try and resolve this remediation, but I'm not hearing a lot of enthusiasm for that idea. Unfortunately, there's not very much to agree upon. I apologize, Your Honor, but the government's position and its APA determination, if I may segue, is appropriate. There was a rational connection between the fact found that Reverend Chen did not possess a valid, unexpired passport and the conclusion it made pursuant to a reasonable regulation. Well, he did have a valid passport at the time he applied, didn't he? However, he must possess that valid, unexpired passport for a period of six months after his intended stay. The B-2 temporary visitor stay is exactly that. He must demonstrate that his visit is temporary and that he has the ability and capacity to return to his initial home country. But he was trying, this is the Catch-22 aspect of this case, he was trying to do that by getting his passport renewed so he could then get a visa to go to Hong Kong, but the Chinese government wouldn't give that to him. And at the time he filled out the paperwork, he did have a valid passport and he filed an explanation, a declaration, and I don't see any evidence that the declaration was ever considered by the agency. Well, the agency did not need to consider something that was not, I mean, they're just, you're right. Well, it's not before because you didn't have a form that said we do it for people who are already here, which is another problem I have under whether or not the agency acted arbitrarily. Well, but this, let me understand this. This is a district court action, right? This is correct. And he's filed it seeking an injunction, right? That's correct. He did seek an injunction. And what he wanted was to change his status? You can answer that. Yes, he wanted to change it. I have two minutes left. I know. Just a little light change. He wanted to change his status from that of an F1 student visa to that of a B2 non-immigrant tourist visa. And he wanted to do that because his statement at the time was that he wanted to wait for the People's Republic of China to issue him a renewed visa to return back to China, particularly Hong Kong, a region where he's not from in China, to be a missionary priest for Society of the Divine Word. And the district court judge denied that temporary restraining order because of the imminent injury factor. And that is his voluntary departure period extended until October 24, 2009, well within the time that the court would be able to decide the issue on the merits. At this juncture, the United States has not issued a notice to appear as of yet, but certainly will issue one at some point. So is this case still before the district court? This case is no longer before the district court. It ultimately granted summary judgment on all of the claims, APA, RFRA, ANZU process. OK, what is the claim to stay the accrual of unlawful presence? What does that affect? To stay the state of unlawful presence? Yeah. Well, in theory, I believe that a state of not accruing unlawful presence would provide an avenue of some sort for Petitioner Mr. Chen, Reverend Chen, to apply for other relief in the United States. But that is only contingent upon his valid unexpired passport. He cannot seek to gain immigration. That period of accrual has already run. It's only 180 days, right? Yes, indeed. He's remained in the United States. He's now out of status. One year and seven days he's been out of status. So there's no injunctive relief that could be issued at this point that would address that problem. Without substantial retroactivity, no. And there's still been no deportation proceedings haven't been instituted yet. But they will be instituted. And the Chinese government still hasn't renewed his passport. That is something that the government does not know. Since the completion of the district court determination, there's been no indication that Reverend Chen has continued to seek to leave the United States, as he should have, and had the opportunity to do so for a one-month period of time. Okay. Thank you. Thank you, Your Honors. I won't take much time at all. And you can tell me to leave. First of all, to clarify, when Father Chen applied for an extension of his passport, he was required to give his passport over to the Chinese government. So this idea that he could have left immediately upon graduation and ordination, not true. He had no travel document at that point. Second, I want to clarify that we do not seek to have him put into B-2 visa status at this point. We are looking for an exemption which would basically consist of reversing the decision that requires a passport to do a change of status in every case and a reasonable grace period within which he would apply for an appropriate visa status, given the change of circumstances. He would basically be applying for a different kind of non-immigrant visa status, the R-1 status, which would allow him to live and work in the United States for up to five years. So he no longer wants to be a tourist? No. It's ridiculous at this point. Okay. The final point is that the government has said he's going to be put in removal proceedings. In Chicago, it is easily two to five years before he would have authority to work in the United States. How about any chance of settling this thing through mediation? We've approached the government on multiple occasions, Your Honor. All right. Thank you. The matter just there, argued, is submitted for decision. We'll hear... Before hearing the last case, which is the common band of Indians versus California, we will take a ten-minute recess. We'll take a ten-minute recess. We'll take a ten-minute recess. We'll take a ten-minute recess. We'll take a ten-minute recess. We'll hear the last case, which is PAMA Band of Indians versus California State University.
judges: Jarvey, Schroeder, Tallman